UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:19-cv-24704-JEM

BLUEGREEN VACATION UNLIMITED,
INC., a Florida corporation; and
BLUEGREEN VACATIONS CORPORATION,
a Florida corporation,

                Plaintiffs,

v.

THE MONTGOMERY LAW FIRM, LLC, a
Missouri limited liability company;
MONTGOMERY & NEWCOMB, LLC, a
Missouri limited liability company; M. SCOTT
MONTGOMERY, an individual; W. TODD
NEWCOMB, an individual; PRINCIPAL
TRANSFER GROUP, LLC, a Missouri limited
liability company; CLS, INC. d/b/a ATLAS
VACATION REMEDIES and also d/b/a
PRINCIPAL TRANSFER GROUP, a Missouri
corporation; JASON LEVI HEMINGWAY, an
individual; and SQUARE ONE
DEVELOPMENT GROUP, INC.

                Defendants.

_____

**M&N LAW'S MOTION FOR
PRELIMINARY INJUNCTION AS TO PLAINTIFFS' SHAM
LITIGATION AND INCORPORATED MEMORANDUM OF LAW**

      Defendant, MONTGOMERY & NEWCOMB LLC ("M&N Law") moves for a preliminary injunction and/or stay as to Plaintiffs' sham litigation against it and its lawyers, M. SCOTT MONTGOMERY and W. TODD NEWCOMB, pursuant to Federal Rule of Civil Procedure 65 and 15 U.S.C § 26.

1

**OVERVIEW**

M&N Law is a law firm that provides legal services through its attorneys, including attorneys M. Scott Montgomery ("Montgomery") and W. Todd Newcomb ("Newcomb"). Much of M&N Law's business is devoted to counseling and representing timeshare owners regarding their contractual rights and defenses relative to timeshare companies. Both in this suit and in a nearly identical one filed by certain Wyndham entities in the Middle District of Florida,[1] timeshare companies have sued M&N Law, Montgomery, and Newcomb (collectively "M&N Law and its attorneys") based on M&N Law's provision of good faith legal services to timeshare owners.[2] These lawsuits are among dozens filed by timeshare companies across the country for the purpose of eliminating businesses dedicated to helping victimized timeshare owners.[3]

In response to the present suit, M&N Law filed a four-count counterclaim. In Count III of its counterclaim, M&N Law asserts that Plaintiffs, in violation of the Clayton Act, colluded with other timeshare companies to pursue this sham litigation for the purpose of maintaining its pricing power and reducing competition in the timeshare industry. [Doc. 64, pp. 28-33]. Count III of M&N Law's Counterclaim then seeks "injunctive relief under 15 U.S.C. §26 . . ." as to the sham litigation. [Doc. 64, p. 32].

---

[1] *See* U.S. District Court, Middle District of Florida Case No. 8:19-cv-1895-CEH-CPT.

[2] M&N Law advises their timeshare owner clients regarding whether they may legally breach their contracts with Plaintiffs when such clients believe that they were fraudulently induced into those contracts or that Plaintiff breached the subject contracts first. Also, M&N Law asserts the defenses of "prior breach" and "fraudulent inducement" on behalf of these clients where M&N Law has an honest, good faith belief (based on their client's representations) that the defenses are applicable.

[3] Indeed, M&N Law has attached to its Counterclaim a non-exhaustive list of 28 lawsuits initiated by timeshare companies *in Florida alone.* [Doc. 64, Exhibit 3]. More have been filed since and this is by no means the entire list.

By this Motion, M&N Law is asking this Court to issue a preliminary injunction pursuant to 15 U.S.C.A. § 26. Specifically, M&N Law is seeking a stay as to Plaintiffs' claims against M&N Law and its attorneys, pending resolution of Count III of the Counterclaim. It is also requesting a nationwide injunction precluding Plaintiffs (and other persons identified in Rule 65(d)(2))[4] from initiating any further lawsuit against M&N Law and its attorneys, in federal or state court, based on their provision of legal services to timeshare owners, until this Court resolves Count III of M&N Law's Counterclaim.

This Court should grant M&N Law preliminary injunctive relief. M&N Law is likely to prevail on its Clayton Act claim. Further, M&N Law and its attorneys are continuing to incur irreparable damage because of Plaintiffs' pending lawsuit and the threat of additional sham lawsuits by other timeshare companies. On the other hand, granting this Motion will not unreasonably delay Plaintiffs' litigation of its claims. Rather, the requested relief will, consistent with the public interest, provide for the orderly, efficient litigation of this matter in a manner that reasonably protects the interests of M&N Law and its attorneys.

---

[4] In part, Federal Rule of Civil Procedure 65(d) provides:

> (d) CONTENTS AND SCOPE OF EVERY INJUNCTION AND RESTRAINING ORDER.
> . . . .
> (2) *Persons Bound.* The order binds only the following who receive actual notice of it by personal service or otherwise:
>
> (A) the parties;
>
> (B) the parties' officers, agents, servants, employees, and attorneys; and
>
> (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

Additionally, because it is not expected that the issuance of the injunction will materially, adversely affect Plaintiffs' interests, M&N Law asks that this Court set no more than a nominal bond amount.

Finally, pursuant to Section 3I(6) of the CM/ECF Administrative Procedures, an initial proposed order is attached as **Exhibit 1** to this motion.

## MEMORANDUM OF LAW

### I.      Introduction

Plaintiffs are entities in the business of developing, selling, and managing timeshare interests. Plaintiffs' goal is to keep unhappy timeshare owners *in their contracts*.

Plaintiffs and other timeshare companies have initiated dozens of lawsuits, including this one, against lawyers and non-lawyers dedicated to helping victimized owners *out of their timeshare contracts*. The timeshare companies' common purpose is to, by litigation, drive these lawyers and non-lawyers out of business. In other words, the point of this spate of litigation is to eliminate the timeshare owner's access to resources relevant to a decision to default, so that timeshare owners are less likely to choose to default and, thereby, have their timeshare interests returned to the market.

By unfairly impeding owners from defaulting and having their timeshare interests returned to market supply, Plaintiffs are artificially suppressing the supply of available timeshares and are, thereby, keeping the market price of timeshares artificially high. Moreover, by unfairly reducing the risk that timeshare owners will default, Plaintiffs' litigation strategy is also artificially reducing the riskiness of its timeshare financing-backed securities and the amount it must pay investors back in the future based on the securities' coupon rate.

**II.     Legal Standard for Entry of a Preliminary Injunction**

A party seeking a preliminary injunction must establish that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000); *see also Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65.

Further, in relevant part, the Clayton Act specifically *entitles* M&N Law to:

> to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . . .

*See* 15 U.S.C.A. § 26. This Act specifically provides that, "upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a *preliminary* injunction may issue . . . ." *See* 15 U.S.C.A. § 26 (emphasis added).[5]

---

[5] Moreover, where, as here, injunctive relief is sought with respect to a Clayton Act violation premised on sham litigation, this Court may enjoin not only enjoin future state court litigation, but also pending state court litigation as well. *See* 28 U.S.C.A. § 2283 (except for specified circumstances, including where "expressly authorized by Act of Congress," District Courts may not stay pending proceedings in State court.); *see also Vill. of Bolingbrook v. Citizens Utilities Co. of Illinois*, 864 F.2d 481, 483–85 (7th Cir. 1988)(quoting *Vendo Co. v. Lektro–Vend Corp.,* 433 U.S. 623, 644 (1977),(Blackmun, J., joined by Burger, C.J.))(indicating that federal courts may enjoin pending state court litigation where "those proceedings are themselves part of a 'pattern of baseless, repetitive claims' that are being used as an anticompetitive device, all the traditional prerequisites for equitable relief are satisfied, and the only way to give the antitrust laws their intended scope is by staying the state proceedings.").

### III.  M&N Satisfies that Standard for Entry of a Preliminary Injunction

The exhibits attached to this motion, together with the Courts' own records, establish that (A) M&N Law is likely to prevail on its Clayton Act claim, (B) that M&N is likely to suffer irreparable harm in the absence of preliminary relief, that (C) the balance of equities tip in favor of issuing a preliminary injunction, and (D) that issuance of the preliminary injunction is in the public interest. This memorandum will address each of these issues, in turn.

### A.  M&N Law is likely to prevail on its Clayton Act claim based on Plaintiffs' Violation of the Sherman Act

To begin with, the Clayton Act, through 15 U.S.C.A. § 15, "creates a private right of action in any person 'injured in his business or property' by reason of any antitrust violation." *See Neumann v. Reinforced Earth Co.,* 786 F.2d 424, 426 (D.C. Cir. 1986). "The elements necessary for recovery under this statute are: (1) a violation of the antitrust laws; (2) the fact of damage causally linked to the violation; and (3) some indication of the amount of damage." *See Perry v. Amerada Hess Corp.,* 427 F. Supp. 667, 674 (N.D. Ga. 1977); (*citing Response of Carolina, Inc. v. Leasco Response, Inc*., 537 F.2d 1307, 1320 (5th Cir. 1976)).

The anti-trust law violation at issue here is of 15 U.S.C.A. § 1.  This Sherman Act provision states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal. . . ." Thus, to establish a § 1 antitrust violation, M&N law must show "(1) a contract, combination, or conspiracy (meaning, an agreement); (2) a resulting unreasonable restraint of trade in a relevant market; and (3) an accompanying 'antitrust injury.'" *See City of Rockford v. Mallinckrodt ARD, Inc.,* 360 F. Supp. 3d 730, 753 (N.D. Ill. 2019), *reconsideration denied*, 17 C 50107, 2019 WL 2763181 (N.D. Ill. May 3, 2019); *see also Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012); *Mason City Tent & Awning Co. v. Clapper*, 144 F. Supp. 754, 768 (W.D. Mo. 1956) ("A

6

conspiracy or combination having as its object, or effect, a restraint of interstate trade and commerce, whether accomplished by legal or illegal means, falls within the ambit of Sections 1 and 2 of the Sherman Act and is condemned thereby.").

In this case, Plaintiffs and other timeshare companies agreed to pursue a pattern of aggressive litigation against individuals and companies in the so-called timeshare exit industry, for the purpose driving such firms out of business. This litigation has resulted in both an unreasonable restraint of trade and an anti-trust injury. Moreover, M&N Law and its attorneys have been damaged and are continuing to be damaged by Plaintiffs' conduct.

> **1. Plaintiffs Agreed with other Timeshare Companies to Pursue the Sham Litigation for a Common Purpose**

For Sherman Act purposes, the requisite agreement may be found based on circumstantial evidence, including the defendants' conduct. *See Esco Corp.* v. United States, 340 F.2d 1000, 1007 (9th Cir. 1965)("A knowing wink can mean more than words."). The United State Supreme Court has explained, "[w]here the circumstances are such as to warrant a jury in finding that the conspirators had *a unity of purpose or a common* design and *understanding*, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified." *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 809–10 (1946)(citation omitted)(emphasis added).

Here, the attached documentation establishes that Plaintiffs and other timeshare companies are, through their common membership in the American Resort Development Association ("ARDA") and/or through common counsel, pursuing a common litigation strategy against those assisting timeshare owners for the purpose of driving these companies and individuals out of business. Specifically, the attached documentation demonstrates that Plaintiffs and the Wyndham

7

litigants (or entities related to them[6]), as well as their common counsel, are all members of ARDA. *See* Affidavit of M. Scott Montgomery, attached as **Exhibit 8**, para. 12.  ARDA and its members view so called timeshare exit companies as a threat and have taken an organized, aggressive stance against such companies and those doing business with them, including through litigation.  *See* **Exhibit 8**, para. 11 & ATT. B (Letter from ARDA Trustee indicating that it was the organization's mission that "year to eradicate timeshare exit firms."); *see also* Declaration of Thomas Breen, para. 10.d., dated April 27, 2020, filed in *Diamond Resorts International, Inc., et al., v. Reed Hein & Associates, LLC, et al.,* Case No. 2:17-cv-03007-APG-VCF (D. Nev. May 1, 2020), attached as **Exhibit 6** (Indicating that, at one ARDA presentation he attended, Mr. Breen learned "that some resorts and their lawyers are intent upon suing all those associated with exits, including lawyers representing timeshare owners and exit companies that help these same consumers.").[7]

Further, the complaints filed by Plaintiffs and the Wyndham litigants against M&N Law, through common counsel, are virtually *identical,* with the second complaint filed while the first

---

[6] The corporate directory for ARDA includes the names "Wyndham Destinations" and "Bluegreen Vacations Corporation."  *See* https://members.arda.org/corporate-directory/

[7] Further, again, the present suit is part of pattern of litigation initiated by the timeshare companies.   In one of the earliest of these lawsuits, timeshare counsel, Richard Epstein, outright stated on the record that the purpose of the ensuing timeshare litigation was to put so-called time share exit companies out of business.  Specifically, Mr. Epstein stated:

> So I don't want to -- I don't want to put a varnish or spin on this. Let's be clear why we're here. We're here to stop fraudulent advertising, fraudulent business practices, and put fake law firms out of business.

*See* Excerpt of transcript of February 1, 2018 Motion Hearing for *Orange Lake Country Club, Inc. & Wilson Resort Finance LLC v. Castle Law Group, PC, et al.*, Case No. 6:17-cv-1044-Orl-31DCI (M.D. Fla.), attached as **Exhibit 2**; *see also See* Declaration of Ken B. Privett, paragraph 12, dated April 22, 2019, filed in *Welk Resort Group, Inc. & Welk Resorts Platinum Owners Assn. v. Reed Hein & Associates, LLC, et al.*, Case No. 3:17-CV-01499-L-AGS (S.D. Cal. April 22, 2019), attached as **Exhibit 3.**

was *pending*. This is not a matter of competitors merely acting consistently with one another. Rather, in context, Plaintiffs pleadings demonstrate a coordinated, strategic decision by Plaintiffs and the Wyndham litigants to apply amplified pressure on M&N Law and its attorneys for purposes of driving them out of business. In this regard, Magistrate Judge Daniel Irick's comments in *Orange Lake Country Club, Inc. & Wilson Resort Finance LLC v. Reed Hein & Associates, LLC, et al.*, Case No. 6:17-cv-1542-Orl-78DCI (M.D. Fla. Sept. 19, 2019), attached as **Exhibit 4,** are illuminating. In that Order, Magistrate Judge Daniel Irick observed:

> At the time this action was filed, it was the fifth similar case brought in this Division of this District during about a one-year period (the first case being brought in June 2017), all 5 of which were brought by the same law firm. Now there are about 18 such cases, brought by the same group of law firms, with 15 pending. To varying degrees, each of these cases has been litigated extensively and has taxed the resources of the Court and the parties. **But the manner in which many of these related plaintiffs sought to utilize the same group of attorneys to simultaneously sue several subsets of defendants was a strategic decision** – one possibly born from an underestimation of the consequences that may flow from the chosen strategy. Certainly, though, **Plaintiffs' strategic decision burdened all counsel with the collective cascade of deadlines that necessarily follow from the near-simultaneous filing of so many fairly complex actions in federal court**.

(Page 2); *see also* Excerpt of transcript of September 12, 2019 Motion Hearing for *Westgate Resorts, Ltd. et al. v. Reed Hein & Associates, LLC, et al.*, Case No. 6:18-cv-1088-Orl-31DCI (M.D. Fla. Sept. 19, 2019)(Motion to Extend Discovery and Other Deadlines), attached as **Exhibit 5.**

In sum, the foregoing establishes an agreement for purposes of the Sherman Act.

### 2. Plaintiffs' Conduct Resulted in an Unreasonable Restraint of Trade

Likewise, the proffered evidence establishes that Plaintiffs' conduct resulted in an "unreasonable restraint of trade" for purposes of establishing a Sherman Act violation. In discussing the "unreasonable restraint of trade" element, one District Court has explained:

> The "unreasonable restraint of trade" prong asks courts to assess "the competitive effects of challenged behavior relative to such alternatives as its abandonment or a less restrictive substitute." Courts use one of three tests to determine the challenged behavior. Courts use a "per se" test for conduct such as horizontal price fixing, market allocation, group boycotts, or tying arrangements that are so inherently anticompetitive, they are considered illegal per se. In contrast, vertical arrangements such as exclusive distribution agreements are analyzed under the "rule of reason" test, which assigns the burden to plaintiffs to sufficiently allege that an agreement has an anticompetitive effect on a given market within a given geographic area. . . . *Courts sometimes employ a third test, known as the "quick-look" test, for conduct that is not plainly anticompetitive but where "no elaborate industry analysis is required to demonstrate the anticompetitive character of ... an agreement."*

*City of Rockford*, 360 F. Supp. 3d at 753–54 (internal citations omitted) (*citing Nat'l Soc. of Prof'l Engineers v. U. S.,* 435 U.S. 679, 692–93 (1978))(emphasis added); *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 772 (8th Cir. 2004)("The United States Supreme Court has set forth three methods for analyzing the reasonableness of a restraint on trade: rule of reason analysis, *per se* analysis, and quick look analysis.").

Courts employ the "quick-look" method of analysis where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999). If the conduct at issue qualifies for the "quick look analysis," the burden then shifts to the defendant to demonstrate "a procompetitive justification for the conduct . . . ." *See Bogan v. Hodgkins,* 166 F.3d 509, 514 n. 6 (2d Cir. 1999).

The manner in which the Supreme Court has applied the "quick-look" method is reflected in both *Nat'l Soc. of Prof'l Engineers,* 435 U.S. 679 (1978) and in *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 457 (1986).  In the *Nat'l Soc. of Prof'l Engineers* case, the United States sued the National Society of Professional Engineers on the ground that its "canon of ethics prohibiting its members from submitting competitive bids for engineering services suppressed competition in violation of § 1 of the Sherman Act."  *See Nat'l Soc. of Prof'l Engineers,* 435 at 679.  In concluding that the canon, on its face, "restrains trade within the meaning of § 1 of the Sherman Act . . . .," the Court explained:

> Price is the "central nervous system of the economy," and an agreement that "interfere[s] with the setting of price by free market forces" is illegal on its face.  In this case we are presented with an agreement among competitors to refuse to discuss prices with potential customers until after negotiations have resulted in the initial selection of an engineer. *While this is not price fixing as such, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.* . . . As the District Court found, the ban *"impedes the ordinary give and take of the market place,"* and substantially deprives the customer of "the ability to utilize and compare prices in selecting engineering services."

*Id.* at 692–93 (internal citations omitted, emphasis added).  Further, in *Indiana Fed'n of Dentists*, the Supreme Court addressed the issue of whether an agreement among members of a dental association to refuse to provide specified information (i.e., x-rays) to insurers related to their services constituted an unreasonable restraint of trade.  *See Indiana Fed'n of Dentists*, 476 U.S. at 457.  In its opinion, the Supreme Court noted:

> *A concerted and effective effort to withhold (or make more costly) information desired by consumers for the purpose of determining whether a particular purchase is cost justified is likely enough to disrupt the proper functioning of the price-setting mechanism of the market that it may be condemned even absent proof that it resulted in higher prices or, as here, the purchase of higher priced services, than would occur in its absence.* Moreover, even if the

> desired information were in fact completely useless to the insurers and their patients in making an informed choice regarding the least costly adequate course of treatment—or, to put it another way, *if the costs of evaluating the information were far greater than the cost savings resulting from its use—the Federation would still not be justified in deciding on behalf of its members' customers that they did not need the information*: presumably, if that were the case, the discipline of the market would itself soon result in the insurers' abandoning their requests for x rays. *The Federation is not entitled to pre-empt the working of the market by deciding for itself that its customers do not need that which they demand.*

*Id.* at 461–62 (1986)(internal citations omitted)(emphasis added); *see also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 107 (1984)(indicating that "[a] restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with this fundamental goal of antitrust law.").

In this matter, this Court should employ the "quick-look" method of analysis to determine that Plaintiffs' conduct resulted in an unreasonable restraint of trade, because even an observer with a rudimentary understanding of economics would conclude that Plaintiffs' litigation has an anti-competitive effect on consumers. Specifically, the purpose of Plaintiffs' lawsuit here and lawsuits like it is to drive out of business those dedicated to helping unhappy timeshare owners out of their contracts. In other words, the point of this litigation is to eliminate the unhappy timeshare owner's access to resources relevant to a decision to default, so that the owner is less likely to choose to default and have his or her timeshare interests returned to the market.[8] The

---

[8] In his Affidavit, Attorney Thomas Breen touches on this issue. Specifically, after attending a 2017 ARDA conference, he observed:

> 11. It was my impression that one of the larger concerns raised at the conference focused on consumers and potential consumers having superior information about the harms they can suffer from doing business with a timeshare company. Suing the lawyers who provide advice, counsel, and

litigation is patently anti-competitive because, by keeping these unwanted timeshare interests from becoming part of the available timeshare supply, the timeshare companies are artificially restricting the supply and increasing the market price of timeshares. Moreover, by reducing the risk that timeshare owners will default, Plaintiffs' litigation strategy is also artificially reducing the riskiness of its timeshare financing-backed securities and the amount it must pay investors back in the future based on the securities' coupon rate.

Furthermore, the timeshare companies' aggressive litigation strategy is designed to eliminate a service that timeshare consumers, themselves, desire. As *Indiana Fed'n of Dentists* indicates, even if the costs of M&N Law's services far exceeded their benefit to timeshare owners, Plaintiffs would still not be justified in deciding for timeshare owners that they do not need M&N Law's services. Plaintiffs are "*not entitled to pre-empt the working of the market by deciding for itself that its customers do not need that which they demand.*" *Indiana Fed'n of Dentists*, 476 U.S. at 462. While Plaintiffs' conduct, is not price fixing as such, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." *See Nat'l Soc. of Prof'l Engineers,* 435 U.S. at 692-93.

> advocacy for these consumers is an obvious method to decrease consumers' options.
> . . . .
>
> 21. It is my belief that Diamond Resorts' lawsuit is designed to try to intimate SGB's clients, and to prevent SGB from providing them the representation they seek and very much need. . . .

*See* **Exhibit 6.**

13

### 3. Plaintiffs' Conduct is Accompanied by an Anti-Trust Injury

Additionally, Plaintiffs' conduct resulted in an anti-trust injury. With respect to the "antitrust injury" element of a Sherman Act violation, the United States Supreme Court has explained that an antitrust injury is an injury of "the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977). "Paying higher prices as a result of coordinated output restrictions is a paradigmatic antitrust injury." *Washington County Health Care Auth., Inc. v. Baxter Int'l Inc.,* 328 F. Supp. 3d 824, 845 (N.D. Ill. 2018)

In this case, Plaintiffs' anti-competitive conduct is keeping timeshare prices artificially high by restricting supply. This is a paradigmatic type of antitrust injury.

### 4. Plaintiffs' Conduct has Damaged M&N Law and its Attorneys

Finally, the affidavits in this matter demonstrate that, due to Plaintiffs' pending lawsuit and the threat that Plaintiffs (and those acting in concert with them) will file additional lawsuits against them, M&N Law and its attorneys have incurred and are continuing to incur exorbitant legal fees, experience business uncertainty, suffer reputational harm, experience limitations in their ability to serve clients, and incur higher business costs, including insurance premiums. *See* **Exhibit 8**, para 15; *see* also Affidavit of W. Todd Newcomb, attached as **Exhibit 9**. Thus, the evidence demonstrates that Plaintiffs' anti-competitive conduct is continuing to harm M&N Law and its attorneys.

In sum and based on the foregoing analysis, it is likely that M&N Law will prevail on the merits of its Clayton Act claim.

### B. M&N is Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief

Again, due to Plaintiffs' pending lawsuit against M&N Law and its attorneys and the threat that Plaintiffs (and those acting in concert with them) will file additional lawsuits against them, M&N Law and its attorneys are continuing to incur exorbitant legal fees, experience business uncertainty, suffer reputational harm, experience limitations in their ability to serve clients, and incur higher business costs, including insurance premiums.  *See* **Exhibit 8**, para 15; *see also* **Exhibit 9**.   These harms, especially the reputational harm and the injury to the public interest, would be impossible to adequately remedy through an award of damages.

### C. The Balance of Equities Tip in Favor of Issuing a Preliminary Injunction

On the other hand, while M&N Law and its attorneys are continuing to suffer because of Plaintiffs anti-competitive practices, it is not expected that granting this Motion will unreasonably delay Plaintiffs' litigation of its claims or otherwise adversely affect Plaintiff.  Rather, what the requested preliminary injunctive relief will do is provide for the orderly, efficient litigation of this matter in a manner that reasonably preserves the interests of M&N Law and its attorneys.   As such, the balance of equities favor issuing a preliminary injunction in this matter.

### D. Issuance of the Preliminary Injunction is in the Public Interest

Additionally, issuance of the preliminary injunction is in the public interest.  These lawsuits are impeding M&N Law and its attorneys from providing much needed counsel to the timeshare owning public.  *See* **Exhibit 8**, generally.   Issuance of the requested preliminary injunction will allow M&N Law and its attorneys to continue to, in good faith, help timeshare owners seeking to dispute Plaintiffs' predatory business practices.

Thus, in sum, this Court should grant this Motion.  The Courts' records and the attached documentation demonstrate that M&N Law is likely to prevail on its Clayton Act claim based on

Plaintiffs' Sherman Act violation. Specifically, Plaintiffs agreed with other timeshare companies to pursue a pattern of aggressive litigation against individuals and companies in the so-called timeshare exit industry, for the purpose driving such firms out of business. This litigation has resulted in both an unreasonable restraint of trade and an anti-trust injury. Moreover, M&N Law and its attorneys have been damaged by Plaintiffs' conduct. Further, M&N Law and its attorneys have suffered and will continue to suffer irreparable harm, absent the requested relief; the balance of equities tip in favor of issuance of the injunction; and issuance of the injunction is consistent with the public interest.

### IV. Alternative Basis for Relief

Finally, M&N law notes that the timeshare companies' aggressive litigation strategy is not only burdening the parties but also the courts. In an order issued just this past March, Magistrate Judge Daniel C. Irick discusses the impact of the timeshare companies' litigation on the courts. He wrote:

> Westgate initiated this action against TET on July 9, 2018, alleging, in part, that TET induces timeshare owners to stop making payments to Westgate or otherwise breach their contracts with Westgate. Doc. 1 (the Initial Complaint). At the time this action was filed, it was the ninth similar case brought in this Division of this District during about a one-year period (the first case being brought in June 2017), and the seventh brought by the same law firm. To varying degrees, each of these timeshare cases has been litigated extensively *and has taxed the resources of the Court and the parties.*

*See Westgate Resorts, LTD., et al, v. Reed Hein & Associates, LLC, Brandon Reed, Trevor Hein and Thomas Parenteau*, Case No: 6:18-cv-1088-GAP-DCI (M.D. Fla. March 25, 2021) (emphasis added), attached as **Exhibit 7**; *see also* **Exhibit 4**.

This Court has broad discretion to stay proceedings pursuant to its power to manage its own docket. *See Garmendiz v. Capio Partners, LLC*, 817CV00987EAKAAS, 2017 WL 3208621,

16

at *1–2 (M.D. Fla. July 26, 2017). In this case, the affidavits and Judge Irick's order demonstrate that there will be a great hardship and inequity to M&N Law and its attorneys, as well as burden to this Court's resources, if M&N Law is required to continue litigating Plaintiffs' claims before M&N Law's Counterclaim is determined. *See Landis v. N. Am. Co.,* 299 U.S. 248, 255 (1936). As such, if this Court declines to issue a preliminary injunction pursuant to 15 U.S.C.A. § 26, M&N Law asks that this Court exercise its inherent authority to stay Plaintiffs' claims until M&N Law's Counterclaim is resolved.

### V.     Conclusion

This is a textbook example of a preliminary injunction that is justified because it will preserve the status quo to prevent irreparable injury until the Court has an opportunity to decide on a permanent injunction, by way of resolving M&N Law's Clayton Act claim. District Court dockets are being squeezed by this concerted and anticompetitive sham litigation—Plaintiffs should have to answer for it before ruining any more *bona fide* businesses, especially those of lawyers seeking to vindicate their clients' rights.

Pursuant to Federal Rule of Civil Procedure 65 and 15 U.S.C § 26, M&N Law asks that this Court enter an order (A) staying Plaintiffs' claims against M&N Law and its attorneys in this litigation and, further, (B) issuing a nationwide injunction precluding Plaintiffs (and other persons identified in Rule 65(d)(2)) from initiating any further lawsuit against M&N Law and its attorneys, in federal or state court, based on their provision of legal services to timeshare owners, until Count III of M&N Law's Counterclaim is resolved.

### REQUEST FOR HEARING

If this Court is disinclined to grant this Motion based on the filings provided, M&N Law respectfully requests an evidentiary hearing pursuant to Southern District Local Rule 7.1(b)(2).

The underlying facts presented in this Motion are straightforward and should be undisputed. However, to the extent that Plaintiffs suggest that a factual issue does exist, M&N Law requests an opportunity to address such factual disputes through a hearing. M&N Law estimates that such an evidentiary hearing would require 4 hours.

**WHEREFORE**, M&N Law respectfully requests that this Court grant M&N Law's Motion for Preliminary Injunction as to Plaintiffs' Sham Litigation and Incorporated Memorandum of Law, and, if not inclined to grant it upon the filings provided, to permit an evidentiary hearing on the same.

Dated: May 20, 2021.

Respectfully submitted,

/s/ Christian W. Waugh
Christian W. Waugh [FBN 71093]
Reba Abraham Pearce [FBN 0027369]
Morgan Fayocavitz [FBN 1015835]
WAUGH GRANT PLLC
201 E. Pine Street, Suite 315
Orlando, FL 32801
Email: cwaugh@waughgrant.com
Email: rapearce@waughgrant.com
Email: mfayocavitz@waughgrant.com
Email: rwood@waughgrant.com com
Telephone:  321-800-6008
Fax:   844-206-0245

*Counsel for M&N Law*